IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
JACKSON
Assigned on Briefs May 2, 2006

## STATE OF TENNESSEE v. JAMES HENRY WALKER

**Direct Appeal from the Circuit Court for Fayette County**
**No. 5591     J. Weber McCraw, Judge**

---

**No. W2005-01739-CCA-R3-CD  - Filed November 7, 2006**

---

Following a jury trial, Defendant, James Henry Walker, was convicted of one count of burglary, a Class D felony; one count of theft of property valued at $500 or less, a Class A misdemeanor; and one count of vandalism of property valued at $500 or less, a Class A misdemeanor.  The trial court sentenced Defendant to concurrent sentences of six years as a Range II, multiple offender, for his felony conviction, and eleven months, twenty-nine days for each misdemeanor conviction, for an effective sentence of six years.  Defendant does not appeal the length of his sentences.  In his appeal, Defendant challenges the sufficiency of the convicting evidence and argues that the trial court erred in denying his motion to suppress his statements and testimony of his identification.  After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHH EVERETT WILLIAMS and J.C. MCLIN, joined.

Matthew P. Armour, Somerville, Tennessee, for the appellant, James Henry Walker.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Terry Dycus, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Background

Captain Bobby Riles with the Fayette County Sheriff's Department received a call on August 3, 2004, that an African-American man wearing a gray t-shirt and blue sweat pants with a white stripe running down the side of the pants was seen on Louise Sansone's property on Sellars Drive in Fayette County.  Officer Albert Williams was dispatched to the scene and reported that the man, who was later identified as Defendant, had left the scene on a green bicycle.

Captain Riles drove by Defendant's house and observed a green bicycle leaning against the porch. Defendant stepped out of the house, dressed in clothes matching the description of the man seen on Ms. Sansone's property. Captain Riles transported Defendant to the Sheriff 's Department in his patrol car.

Captain Riles stated that he advised Defendant of his *Miranda* rights and then asked Defendant to read the Admonition of a Waiver form for himself. Defendant read the form and executed the written waiver of his *Miranda* rights. Captain Riles said that Defendant appeared lucid and indicated that he understood the waiver form and its implications. Defendant was not handcuffed during the interview. Captain Riles stated that no threats were made or promises extended during the process.

Captain Riles asked Defendant if he would give a written statement of the incident, but Defendant refused. Captain Riles said that Defendant told him, however, "I don't know why I did it. I need some help." Captain Riles said that Investigator Ricky Wilson with the Fayette County Sheriff's Department, stopped by Captain Riles' office at this point. Defendant asked if he could speak with Investigator Wilson alone, and Defendant and Investigator Wilson left Captain Riles' office.

Captain Riles said that a fence surrounded Ms. Sansone's property, with access through a locked gate. Several items were discovered stacked in a pile in the northeast corner of the property next to the fence, including a picnic table and benches, a folding pool table, and an electric heater. The items were approximately fifty to seventy-five feet from the house. A partially disassembled outdoor swing was located under some trees about twenty-five to thirty feet in front of the house.

On cross-examination, Captain Riles acknowledged that there was no written record of Defendant's statement. Captain Riles agreed that Defendant never said that he had entered the house on the property. Captain Riles said that Defendant was not in possession of any property belonging to Ms. Sansone when he was apprehended. Captain Riles said that Defendant's house was between two and one-half to three miles from the Sansone property. Captain Riles said that the investigating officers did not attempt to lift any fingerprints at the scene.

Jimmy Huddleston lives on the east side of Ms. Sansone's house. Mr. Huddleston testified that he knew Defendant, and that he saw Defendant riding a bicycle in front of his house at around 7:00 a.m. on August 3, 2004. Mr. Huddleston said that Defendant was traveling west on Sellars Road toward the Sansone house.

Shannon Savage lives directly across from Ms. Sansone's house. Ms. Savage said that she did not know Defendant personally, but she had seen Defendant walking down Sellars Road on numerous occasions. Ms. Savage said that she heard banging noises coming from Ms. Sansone's yard on the morning of August 3, 2004. Ms. Savage turned off her television set and looked out her front window. Ms. Savage said she observed an African-American man on the Sansone property

taking apart an outdoor swing and setting the parts down on the ground. Ms. Savage identified Defendant at trial as the man she had seen disassembling Ms. Sansone's swing.

Ms. Savage said that Defendant abandoned his efforts to disassemble the swing and began walking east toward Mr. Huddleston's house. Ms. Savage called the Sheriff's Department and provided a description of Defendant and his clothes.

Ms. Savage acknowledged on cross-examination that although she knew Defendant's face, she did not know his name at the time of the incident. Ms. Savage did not remember seeing Defendant with a bicycle that morning. Ms. Savage said that she did not identify Defendant by name when she reported the incident to the Fayette County Sheriff's Department.

Fred Sansone testified that he lived at 2500 Sellars Drive. Mr. Sansone said that he had given his mother, Louise Sansone, one acre out of his own acreage for a family summer home, and it was this property on which Defendant was observed. The house was used for family gatherings, and Ms. Sansone would stay in the house for two to three weeks at a time. Mr. Sansone looked after the property when it was vacant, and occasionally stayed in the house. Mr. Sansone said that he had the keys to the house and kept the house locked when it was unoccupied. Mr. Sansone said that the utilities to the house were in his name, that he made sure that property taxes were timely paid, and that he performed maintenance to the interior and exterior of the house when needed. Louise Sansone, who was ninety-two years old at the time of the incident, lived in a nursing home in Memphis, Tennessee, and was non-ambulatory because of various ailments.

Mr. Sansone identified the picnic table, pool table, electric heater, and outdoor swing as belonging to his mother. Mr. Sansone knew Defendant, and he stated that Defendant did not have permission to come onto the property. Mr. Sansone also stated that his mother was upset when she found out about the break-in. Mr. Sansone said that the picnic table and benches found in the northeast corner of the property had been kept in a screened-in porch at the back of the house. Mr. Sansone said that the screen on the porch door had been pushed in and the latch unlocked. Mr. Sansone said that he was not home at the time of the incident. He acknowledged on cross-examination that he did not see Defendant on the property.

Investigator Wilson testified that he knew Defendant, and that he and Defendant had been on "relatively friendly" terms over the years. Investigator Wilson said he noticed that Defendant was in Captain Riles' office on August 3, 2004, and walked into the office. Defendant asked to speak to Investigator Wilson, and Investigator Wilson escorted Defendant to his office. Investigator Wilson left his office door open, and the two men sat down. Investigator Wilson asked Defendant what was going on, and Defendant said he needed help with a drug problem. Investigator Wilson asked Defendant, "Why did you do this?" Defendant responded, "I don't know. I don't know what I would do with a swing set. I don't know," and again asked for help with his drug problem. Investigator Wilson said that he did not memorialize Defendant's statements in writing. Investigator Wilson said that the conversation lasted between five to ten minutes.

On cross-examination, Investigator Wilson said he was not involved in the investigation of Defendant's case and did not speak to any witnesses.

## II. Motion to Suppress

Prior to trial, defense counsel filed a motion to suppress Defendant's statements to Captain Riles and Investigator Wilson, and to suppress his identification as the perpetrator of the offense which Defendant contended resulted from an impermissible "show-up" identification.

At the suppression hearing, Captain Riles testified that after Defendant was apprehended at his house, Captain Riles placed Defendant in the patrol car, went back to Ms. Sansone's house, and then transported Defendant to the Sheriff's Department. Captain Riles said that Captain Gerald Kelley advised Defendant of his *Miranda* rights at the station, and Defendant executed a written waiver of his rights. Captain Riles asked Defendant if he wanted to give a written statement. Defendant refused, and then stated, "But the reason I was there, I was just moving the stuff out close to the road."

Captain Riles said that Defendant did not appear to be under the influence of drugs or alcohol, and no coercion was involved. Defendant refused to respond to further questioning, and the questioning ceased.

Captain Riles said that the investigating officers talked to the victim and witnesses on the day of the offenses, and that the witnesses later submitted written statements. Captain Riles said that Mr. Sansone knew Defendant because Mr. Sansone had asked Defendant not to fish on his property a number of times over the past few years. Ms. Savage, and her husband, Tim Savage, had encountered similar problems with Defendant's uninvited presence on their property.

On cross-examination, Captain Riles said that Ms. Savage wrote out her statement and gave it to one of his investigators either later that day or the day after the offenses. Captain Riles said that he did not talk to Ms. Savage at the crime scene.

Officer Albert Williams, with the Fayette County Sheriff's Department, responded to Ms. Savage's call about someone on the Sansone property. Officer Williams said that no one was there when he arrived, and he went across the street to talk to Ms. Savage at her house. Ms. Savage gave him a description of the man she had seen, including his clothes and the fact that he was riding a bicycle. Officer Williams said that Ms. Savage did not mention Defendant by name.

Captain Kelley testified that Captain Riles first told him that the man involved in the incident was possibly Defendant. Caption Kelley was aware of the description of the perpetrator's clothing, and that Captain Williams had said that the perpetrator was riding a green bicycle.

Ms. Savage testified that she saw a man in a gray t-shirt and blue sweat pants with a stripe down the side taking apart an outdoor swing at Ms. Sansone's vacant house. Ms. Savage said that

she told the officers that the man she had seen was Defendant, but then stated that she later learned Defendant's name from her husband and her neighbors. Ms. Savage said that she knew who Defendant was because she had seen him in the neighborhood several times.

Ms. Savage said she did not make an identification of Defendant as the perpetrator of the offenses at the crime scene immediately following the offenses. Ms. Savage said that she described the man she had seen on the property to the officers, and that her neighbors supplied the police officers with the man's name. Ms. Savage said that although she had not met Defendant personally, she knew what he looked like.

At the conclusion of the suppression hearing, the trial court denied Defendant's motions.

### A. Motion to Suppress Statements

Defendant contends that the trial court erred in not granting his motion to suppress his statements to Captain Riles and Investigator Wilson because Defendant contends that he was interrogated after he was taken into custody but before he was advised of his *Miranda* rights.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, the application of the law to the facts is a question of law which is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect the accused from compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, government authorities are prohibited from using statements made by the accused during custodial interrogation unless the accused has been previously advised of his or her constitutional right against compulsory self incrimination and right to an attorney, and the accused knowingly and voluntarily waives those rights. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). Whether the waiver of a right is voluntarily and knowingly made is determined by the totality of the circumstances under which the right was waived. *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992) (citations omitted).

At the suppression hearing, Captain Riles testified that Defendant was transported to the Fayette County Sheriff's Department on the morning of the offenses. Defendant was read his *Miranda* rights, then provided with the Admonition of Waiver form. Defendant read the form and executed a waiver of his *Miranda* rights, including his right to have counsel present, and his right to remain silent. There is no evidence in the record contradicting Captain Riles' testimony that Defendant's oral statements were made after he was advised of his *Miranda* rights and had executed a written waiver of those rights. Captain Riles testified that Defendant's statements were made voluntarily and without coercion on the part of the investigating officers.

Based on our review, we find no error in the trial court's denial of Defendant's motion to suppress his statements. Defendant is not entitled to relief on this issue.

## B. "Showup" Identification

Defendant contends that the trial court erred in denying his motion to suppress the witnesses' identification testimony, including that of Ms. Savage, because Defendant's identity as the perpetrator of the offenses was revealed during an impermissibly suggestive "show-up" identification procedure at the crime scene.

Convictions based on eyewitness identification at trial following a pre-trial identification will be set aside if the identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). "It has long been recognized that showups are inherently suggestive and unfair to the accused." *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). A showup occurs when police officers bring a lone suspect to a witness and ask the witness to identify the suspect. *See id.* at 381 n.1. The use of a showup, however, may be warranted if (1) imperative circumstances necessitating the showup exist, or (2) the showup occurs as part of an on-the-scene investigatory procedure shortly after the commission of the crime. *Id.* at 381.

Ms. Savage was the only witness at trial who identified Defendant as the perpetrator of the offense. Ms. Savage knew who Defendant was, as did all the neighbors, but she did not know Defendant's name. Ms. Savage provided the police with a physical description of the suspect and a detailed description of the clothes he was wearing. The investigating officers developed Defendant as a suspect based on Ms. Savage's descriptions. When the officers arrived at Defendant's house, Defendant was standing on the porch dressed in clothes that matched Ms. Savage's description. Ms. Savage testified at the suppression hearing that she did not participate in a showup identification procedure at the crime scene.

Captain Riles testified during the suppression hearing that he and Captain Kelly "put [Defendant] in the [patrol] car, went back to the location. Carried him to the jail, booked him in, advised him of his rights." Captain Riles testified that he talked to witnesses at the crime scene on the morning of the offenses, but Ms. Savage was not there. Ms. Savage testified that she did not make an identification at the crime scene, "but our neighbors did." While Ms. Savage's testimony is somewhat ambiguous as to what transpired at Ms. Sansone's house after Defendant was arrested, there is nothing in the record to suggest that Defendant was subjected to an impermissible showup identification procedure.

Based on our review of the record, we conclude that the trial court did not err in denying Defendant's motion to suppress on this issue.

## III. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his convictions. When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

"A person commits burglary who, without the effective consent of the property owner . . . enters a building, with intent to commit a felony, theft, or assault." T.C.A. § 39-14-402(a)(3). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. § 39-14-103. An "owner," for purposes of the theft statutes, is defined as "a person other than the defendant, who has possession of . . . property, . . . and without whose consent the defendant has no authority to exert control over the property." *Id*. § 39-11-106(26). "Any person who knowingly causes damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent is guilty" of the offense of vandalism. *Id*. § 39-14-408(a).

Mr. Sansone testified that he had the keys to his mother's unoccupied house and was charged with the responsibility of the house's maintenance and security while she was incapacitated in a nursing home. Mr. Sansone said that the utilities to the house were in his name, and he was responsible for paying the bills. Mr. Sansone said that he sometimes stayed in the house in addition to other family members. The house was locked in the family's absence. Mr. Sansone said that Defendant did not have permission to be on the property. On August 3, 2004, Mr. Sansone discovered that the locked door to the home's utility room had been forced open, and the screen to the back porch had been pushed in so that the latch could be opened. Some bolts which held the yard swing together were missing and had to be replaced. Mr. Sansone said that both the utility door and screen door leading to the back porch were damaged. Mr. Sansone said that the cost of replacing the bolts and fixing the two doors was minimal.

A picnic table and bench, a pool table which had been folded up, and an electric heater were discovered stacked in a pile next to the fence surrounding the property. The pile of goods, which Mr. Sansone identified as belonging to his mother, was located in the property's northeast corner beneath some trees, and approximately fifty to seventy-five feet from the house. Defendant told Captain Riles, "I don't know why I did it. I need some help." Later, Defendant asked to speak to Investigator Wilson whom Defendant knew. Defendant said he did not know why he committed the offense, stating "I don't know what I would do with a swing set."

Based on the unique facts presented in the case *sub judice*, and Defendant's statements to the investigating officers, we conclude that a rational trier of fact could find beyond a reasonable doubt that Mr. Sansone was the "owner" of the property for purposes of the offenses, that Defendant entered the unoccupied house through a locked screen door without consent, exercised control over the property kept on the back porch and other items by moving them to a different location and by disassembling the yard swing, and that he caused damage to the property during the commission of the offenses. Based on the foregoing, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of the offenses of burglary, theft of property less than $500, and vandalism of property less than $500. Defendant is not entitled to relief on this issue.

## CONCLUSION

After review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE